[No. B186402. Second Dist., Div. Eight. Oct. 31, 2006.]

ELIZABETH A. DAUGHERTY et al., Plaintiffs and Appellants, v. AMERICAN HONDA MOTOR CO., INC., Defendant and Respondent.

Counsel

Robins, Kaplan, Miller & Ciresi, Steven D. Archer and David Martinez for Plaintiffs and Appellants.

O'Melveny & Myers, Wallace M. Allan, Eric Y. Kizirian; and John W. Alden, Jr., for Defendant and Respondent.

Opinion

**BOLAND, J.**—

## SUMMARY

Plaintiffs brought a nationwide class action lawsuit alleging an automobile manufacturer breached its express warranties and violated federal and state consumer protection laws, by failing to disclose an engine defect that did not cause malfunctions in the automobiles until long after the warranty expired. The trial court sustained the manufacturer's demurrer to the second amended complaint without leave to amend. Finding no breach of warranty and no violation of federal or state statutes in the conduct alleged in the complaint, we affirm the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

On December 31, 2003, Elizabeth A. Daugherty and 11 other plaintiffs (collectively, Daugherty or plaintiffs) filed a nationwide class action lawsuit against American Honda Motor Co., Inc., and related companies. The putative class consisted of persons and entities in the United States, Puerto Rico and the United States Virgin Islands who purchased or leased model year 1990–1997 Accord and Prelude automobiles equipped with a type of engine denominated the F22 engine. The suit alleges the F22 engine manufactured by Honda had a defect resulting, over time, in the slippage or dislodgment of the front balancer shaft oil seal. According to the suit, the defect causes oil loss and contamination of nearby engine parts and, in severe cases, requires repair or replacement of the engine. The defect may be easily repaired by installing a retainer bracket designed to maintain the oil seal in its proper position.

The second amended complaint (complaint) alleges that, after the introduction of the F22 engine in the 1990 Accord and Prelude, Honda received adverse event reports and actual notice that automobiles equipped with F22 engines "were experiencing severe mechanical problems as a direct and proximate result of oil leaking from the front balancer shaft oil seal," and knew or should have known that as a result of the engine defect, the oil seal could slip or become dislodged from the engine block, causing oil to leak onto and damage the nearby timing and balancer belts, and "potentially causing further damage to the F22 Engine itself." In response to the adverse events reports, Honda designed a retainer bracket to prevent dislodgment of the oil seal.

In October 2000, Honda initiated a "product update campaign," targeting only the 1994–1996 model year Accord and Prelude automobiles and early production runs of the 1997 model year automobiles, and issued a press release announcing the details of the campaign. The campaign included an offer for free installation of a retainer bracket. In March 2001, the campaign was expanded to include an offer to replace any dislodged oil seal, contaminated timing and balancer belts, and damaged engines discovered during installation of the retainer bracket. Some, but not all, owners of 1994–1997 model year automobiles were also offered reimbursement for previous repair costs resulting from the defect. The complaint alleges owners of 1990–1993 model year Accords and Preludes were not notified of the campaign or the defect, even though the defect also affected their automobiles, and adequate notice was not given to a significant number of owners of 1994–1997 models. As a result, hundreds of thousands of owners have been or will be forced to pay to repair or replace the front balancer shaft oil seal and for damage to timing and balancer belts and other engine damage. The complaint alleges Honda, despite constructive and actual knowledge of the defect, deliberately failed to remedy it and failed to warn the public of the risk of damage by and from the defect.

The named plaintiffs first discovered the defects in their cars—most of which were purchased used—in 2001 (some discovered it in 2003), when the mileage on the cars ranged from 57,000 to 169,000 miles.[1] One plaintiff alleges his 1996 Accord suffered an oil leak causing total engine failure in 2001, at 57,000 miles. Three cars owned by four other plaintiffs "suffered

---

[1] Three automobiles owned by five plaintiffs were bought in 1990, 1993 and 1996 during the then current model year, although the complaint does not allege they were new when purchased.

an oil leak from the front balancer shaft oil seal and malfunctioned," at 60,000, 162,000 and 116,000 miles, respectively. The remaining seven named plaintiffs do not allege their automobiles have yet suffered any oil leak or malfunction.

Based on the facts alleged, Daugherty asserted causes of action for breach of express warranty; violation of the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (15 U.S.C. § 2301 et seq.); unlawful, unfair and fraudulent business practices in violation of the unfair competition law; and violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.). Plaintiffs sought class certification, compensatory and punitive damages, attorney fees and injunctive relief. The injunctive relief sought included an injunction requiring Honda to continue the product update campaign begun in October 2000 and extend its provisions to include 1990–1993 model year Accords and Preludes; notify all owners of its offer to provide free installation of a retainer bracket; and replace any dislodged oil seals, contaminated belts and damaged engines found during the installation of the bracket. Alternatively, Daugherty sought an injunction compelling Honda to create a fund available to remedy the defect and requiring Honda to bear the cost of notice to class members regarding the availability of funds to remedy the defect. Daugherty also sought an injunction requiring Honda to disgorge all profits wrongfully obtained through the unlawful, unfair and fraudulent business practices alleged.

The trial court sustained Honda's demurrers to the original, first and second amended complaints, in the last instance without leave to amend. The trial court observed: "Opening the door to plaintiffs' new theory of liability would change the landscape of warranty and product liability law in California. Failure of a product to last forever would become a 'defect,' a manufacturer would no longer be able to issue limited warranties, and product defect litigation would become as widespread as manufacturing itself. If such a change is to come, another court must be its harbinger."

Daugherty filed a timely appeal from the subsequent judgment of dismissal.

## DISCUSSION

We agree with the trial court that Daugherty failed to state a claim under any of the four causes of action alleged in the complaint, and discuss each cause of action in turn.

I. *Breach of express warranty.*

Honda's express warranty to purchasers covered automobiles "for 3 years or 36,000 miles, whichever comes first," and stated Honda would "repair or replace any part that is defective in material or workmanship under normal use . . . ." It is undisputed that the defect in the F22 engines did not cause any malfunction in the automobiles of the named plaintiffs within the warranty period, and in many cases still has not done so. Daugherty argues, however, that Honda's warranty does not require discovery of the defect during the warranty period, and that a defect that exists during the warranty period is covered, particularly where it results from an "inherent design defect," if the warrantor knew of the defect at the time of the sale. We disagree.

■ The law governing express warranties is clear. A warranty is a contractual promise from the seller that the goods conform to the promise. If they do not, the buyer is entitled to recover the difference between the value of the goods accepted by the buyer and the value of the goods had they been as warranted. (Cal. U. Com. Code, §§ 2313, subd. (1)(a), 2714, subd. (2).) A seller may limit its liability for defective goods by disclaiming or modifying a warranty. (*Krieger v. Nick Alexander Imports, Inc.* (1991) 234 Cal.App.3d 205, 212–213 [285 Cal.Rptr. 717].) The general rule is that an express warranty "does not cover repairs made after the applicable time or mileage periods have elapsed." (*Abraham v. Volkswagen of America, Inc.* (2d Cir. 1986) 795 F.2d 238, 250 (*Abraham*).)

Several courts have expressly rejected the proposition that a latent defect, discovered outside the limits of a written warranty, may form the basis for a valid express warranty claim if the warrantor knew of the defect at the time of sale. (*Abraham, supra,* 795 F.2d at pp. 249–250; *Walsh v. Ford Motor Co.* (D.D.C. 1984) 588 F.Supp. 1513, 1536 (*Walsh I*) [citing cases].) *Abraham* explained: "[V]irtually all product failures discovered in automobiles after expiration of the warranty can be attributed to a 'latent defect' that existed at the time of sale or during the term of the warranty. All parts will wear out sooner or later and thus have a limited effective life. Manufacturers always have knowledge regarding the effective life of particular parts and the likelihood of their failing within a particular period of time. . . . [M]anufac-turers . . . can always be said to 'know' that many parts will fail after the warranty period has expired. A rule that would make failure of a part actionable based on such 'knowledge' would render meaningless time/mileage limitations in warranty coverage." (*Abraham, supra,* 795 F.2d at

p. 250.) Similarly, *Walsh I* observed that: "[T]o hold that all latent defects are covered under the written warranty, whether they become apparent to the customer before or after the expiration of the written warranty, would place an undue burden on the manufacturer. [The manufacturer] would, in effect, be obliged to insure that a vehicle it manufacturers is defect-free for its entire life." (*Walsh I, supra,* 588 F.Supp. at p. 1536.)

Daugherty points to *Alberti v. General Motors Corp.* (D.D.C. 1985) 600 F.Supp. 1026 (*Alberti*), which found that the reasoning in *Walsh I* did not apply to a class action claim of breach of warranty for a defective braking system, where 72 of 127 named plaintiffs did not experience any difficulty with their automobiles during the written warranty period. *Alberti* observed the plaintiffs alleged the defect "was patent—at least to GM—in the sense that, as each automobile was sold, it exposed the owner (and the public) to the potential of a loss of vehicle control." (*Id.* at p. 1028, fn. omitted.) The court concluded the plaintiffs incurred the loss—the diminished value of their automobiles—at the time of sale, "for it was then that GM broke its warranty that the brakes would function safely, and that the automobiles were merchantable and fit for the purpose of providing the ordinary transportation plaintiffs expected of them." (*Ibid.*) Like the court in *Abraham*, "[w]e do not find the reasoning of *Alberti* persuasive and decline to follow it." (*Abraham, supra,* 795 F.2d at p. 250.) As *Abraham* points out, the *Alberti* court apparently confused concepts of express and implied warranty (perhaps because *Alberti* also involved implied warranty claims) when it concluded General Motors breached its warranty that the automobiles were "merchantable and fit for the purpose" of providing ordinary transportation. (*Alberti, supra,* 600 F.Supp. at p. 1028.) Daugherty makes no implied warranty claims. *Alberti* also is factually inapposite, because a significant number of the named plaintiffs in *Alberti* alleged problems during the warranty period.[2] (*Id.* at p. 1027.)

At its core, Daugherty's claim is that because the language of Honda's express warranty did not state that the defect must be "found," "discovered"

---

[2] Indeed, eight years later, after similar actions filed elsewhere in the country were consolidated with the action brought by Alberti, the district court dismissed the claims of those purchasers whose vehicles never experienced "premature rear wheel lock-ups." The court asked "whether a breach of warranty claim can ever be stated with respect to a product that in service performs precisely as it was represented it would, although others presumably identical to it have failed," and answered in the negative. (*Barbarin v. General Motors Corp.* (D.D.C., Sept. 22, 1993, No. 84-0888(TPJ)) 1993 U.S.Dist. Lexis 20980, pp. 5–7.) The court observed: "[A] contrary rule would, in effect, contemplate indemnity for a potential injury that never, in fact, materialized; compensation would have to be paid for a product 'defect' that was never made manifest, in a product that for the life of any warranty actually performed as the warrantor guaranteed it would." (*Id.* at p. 7.)

or "manifest" during the warranty period, the warranty covers any defect that "exists" during the warranty period, no matter when or whether a malfunction occurs. We agree with the trial court that, as a matter of law, in giving its promise to repair or replace any part that was defective in material or workmanship and stating the car was covered for three years or 36,000 miles, Honda "did not agree, and plaintiffs did not understand it to agree, to repair latent defects that lead to a malfunction after the term of the warranty." Accordingly, the court properly sustained Honda's demurrer to Daugherty's cause of action for breach of express warranty.[3]

## II. *Violation of the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act.*

The Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (Magnuson-Moss), 15 United States Code section 2301

---

[3] Daugherty cites several other cases not involving automobile warranties to support her assertion that she may recover for breach of warranty even though no malfunction occurs during the warranty period: *Northeastern Power Co. v. Balcke-Durr, Inc.* (E.D.Pa., Aug. 23, 1999, No. 97-CV-4836) 1999 U.S.Dist. Lexis 13437, involved a one-year express warranty for an air preheater in an electric cogeneration facility. The court found the warranty language "would allow for coverage of manifest but undiscovered defects due to the fault of the seller," and found fact questions "as to whether the defective holes and perforations in the preheater plate manifested themselves during the express warranty period." (*Id.* at p. 17.) We fail to see how this case assists Daugherty, as the defect in the F22 engines did not manifest itself during the warranty period; moreover, in *Northeastern Power*, the seller was notified of air leakage defects within the one-year period, which the buyer argued should have indicated to the seller the existence of the defective holes and perforations. (*Id.* at p. 14.)

Likewise of no avail is *Lidstrand v. Silvercrest Indus.* (1981) 28 Wn.App. 359 [623 P.2d 710], which involved a one-year express warranty for a mobilehome. In *Lidstrand*, the seller had notice of the defects almost immediately after the original owners took possession and had further timely notice just after the plaintiffs took possession. The court concluded that defects "which became apparent after the 1-year period were related to and caused by the same defects which existed at the time the mobile home was manufactured." (*Id.* at pp. 364–365.)

*Metowski v. Traid Corp.* (1972) 28 Cal.App.3d 332 [104 Cal.Rptr. 599] held the plaintiffs could maintain a class action on their claims for breach of express warranty on an electronic color camera. (*Id.* at pp. 339–341.) The defendants claimed a class action was not appropriate because timely notice of the breach of warranty could be proved only by testimony from individual purchasers. The court disagreed, observing that, where merchandise was sold under circumstances indicating that the seller acted in bad faith and was aware of the breach at the time of the sale, "demand for notice of the breach from each and every member of the class may be a meaningless ritual." The court merely stated that, "Conceivably, the statutory demand for notice might be satisfied by proof of complaints from some but not all the buyers of the product." (*Id.* at p. 339.) We fail to see how this case assists Daugherty, as none of the named plaintiffs gave notice of the alleged breach within the warranty period. And, while Daugherty claims to have alleged that Honda "acted in bad faith at the time of sale," the allegations Honda knew of the defect at the time of the sale are not the equivalent of facts showing bad faith.

et seq., authorizes a civil suit by a consumer to enforce the terms of an implied or express warranty. Magnuson-Moss "calls for the application of state written and implied warranty law, not the creation of additional federal law," except in specific instances in which it expressly prescribes a regulating rule. (*Walsh v. Ford Motor Co.* (D.C. Cir. 1986) 257 U.S. App.D.C. 85 [807 F.2d 1000, 1012] (*Walsh II*).) Accordingly, the trial court correctly concluded that failure to state a warranty claim under state law necessarily constituted a failure to state a claim under Magnuson-Moss.

Daugherty asserts she has properly pled a cause of action under Magnuson-Moss, even in the absence of a state law warranty claim. However, the only authority cited in support of this contention is *Alberti, supra,* 600 F.Supp. at page 1028. *Alberti*, a class action under Magnuson-Moss, did not discuss whether a warranty claim could be stated under Magnuson-Moss if no claim could be stated under state law. Even if it had, the district court's opinion in *Alberti* would have been effectively overruled by the circuit court of appeals' later decision in *Walsh II* holding otherwise. Moreover, *Abraham, supra,* 795 F.2d 238, was likewise a class action suit under Magnuson-Moss, and held, as discussed, that express warranties did not cover automobile defects manifesting themselves after expiration of the time and mileage limits of the relevant warranties. The trial court did not err in finding no claim was stated under Magnuson-Moss.

III. *Violation of the Consumers Legal Remedies Act.*

■ The Consumers Legal Remedies Act (CLRA) proscribes specified "unfair methods of competition and unfair or deceptive acts or practices" in transactions for the sale or lease of goods to consumers. (Civ. Code, § 1770, subd. (a).) The unlawful acts or practices include:

—"Representing that goods . . . have . . . characteristics . . . which they do not have . . . ." (Civ. Code, § 1770, subd. (a)(5)); and

—"Representing that goods . . . are of a particular standard, quality, or grade, . . . if they are of another." (Civ. Code, § 1770, subd. (a)(7).)

Daugherty alleges Honda violated the CLRA by "[c]oncealing and failing to disclose" that the 1990–1997 model year Preludes and Accords equipped with F22 engines contain a defect, and by continuing to market and sell defective cars notwithstanding knowledge of the defect. Daugherty further alleges Honda issued a partial product update campaign and press releases designed to and likely to mislead owners of 1990–1993 models into believing

that their cars were not defective, and failed to give proper notice of the defect to 1994–1997 model year owners. We agree with the trial court that these allegations do not state a violation of the CLRA.

The complaint fails to identify any representation by Honda that its automobiles had any characteristic they do not have, or are of a standard or quality they are not. All of plaintiffs' automobiles functioned as represented throughout their warranty periods, and indeed many still have experienced no malfunction. Daugherty insists, however, that the CLRA should be broadly interpreted to include claims based exclusively on fraudulent omissions, and for this proposition cites *Outboard Marine Corp. v. Superior Court* (1975) 52 Cal.App.3d 30 [124 Cal.Rptr. 852] (*Outboard Marine*). In *Outboard Marine*, the court held that the practices proscribed by the CLRA—specifically, "[r]epresenting that goods . . . are of a particular standard, quality, or grade, . . . if they are of another" (Civ. Code, § 1770, subd. (a)(7))—included "a proscription against a concealment of the characteristics, use, benefit, or quality of the goods contrary to that represented." (*Outboard Marine, supra,* 52 Cal.App.3d at p. 37.) As the court observed, it is "fundamental that every affirmative misrepresentation of fact works a concealment of the true fact." (*Id.* at p. 36.) While we do not disagree with *Outboard Marine*, it does not assist Daugherty, because the complaint does not allege any representation of fact that "works a concealment of the true fact." (*Ibid.*) In other words, and as *Outboard Marine* also opined, the CLRA proscribes a concealment of characteristics or quality "contrary to that represented," but in Daugherty's case, no representation was made to which the alleged concealment was contrary. (52 Cal.App.3d at p. 37.)

The facts in *Outboard Marine* clarify the point. In that case, the defendant manufactured an off-road vehicle (trackster), and represented that it "was designed to operate within the parameters" of certain specifications, including gradeability (100 percent grade or 45 degrees plus); side hill ability of 45 degrees; traction " 'to get . . . up grades as steep as 100 percent and even greater' "; "makes the impassable possible"; "runs smoothly over rocks, stones and rough places"; and was " 'the most reliable all-terrain vehicle ever produced . . . .' " At the same time, the defendant allegedly knew, but did not disclose, that the vehicle would not operate within its design criteria, the vehicle was unstable and would roll over forward on a downgrade, and its braking system was "totally defective." (*Outboard Marine, supra,* 52 Cal.App.3d at p. 34.) The court held this conduct "unquestionably falls within the activities proscribed by" the CLRA. (52 Cal.App.3d at p. 36.) The court

compared the plaintiff's allegations of misrepresentations under the CLRA with its allegations in a second cause of action for fraudulent concealment, and concluded the two causes of action "allege, in different language, identical conduct." (*Outboard Marine*, at p. 37.) The court explained: "The [CLRA] cause of action alleges, among other things, that the [trackster] has 'Great ability: 100% grade or 45 degrees plus' while the [fraudulent concealment] cause of action stated that it was concealed that the trackster did not have that capability; to say that the hydrastatic transmission provides 'positive braking' as alleged in the [CLRA] cause of action, necessarily conceals that the braking system is 'totally defective.' The allegation that the trackster's 'maneuverability is unsurpassed' because of the t-bar control as alleged in the [CLRA] cause of action necessarily conceals that '[t]he control handle (t-bar) aggravates the latent instability of the machine' as alleged in the [fraudulent concealment] cause of action." (*Ibid.*) The court therefore concluded that the CLRA's proscription against " '[r]epresenting that goods . . . are of a particular standard . . . if they are of another' " includes a prohibition on "concealment of the characteristics a contrary to that represented."[4] (*Outboard Marine, supra*, 52 Cal.App.3d at p. 37.)

In short, although a claim may be stated under the CLRA in terms constituting fraudulent omissions, to be actionable the omission must be contrary to a representation actually made by the defendant, or an omission of a fact the defendant was obliged to disclose. In Daugherty's case, no representation is alleged relating to the F22 engine, which functioned as warranted. Accordingly, no claim has been stated.[5]

The Court of Appeal in *Bardin v. DaimlerChrysler Corp.* (2006) 136 Cal.App.4th 1255 [39 Cal.Rptr.3d 634] (*Bardin*) recently reached precisely the same conclusion. In *Bardin*, the manufacturer used tubular steel in the exhaust manifolds of some of its vehicles instead of more durable and more

---

[4] *Outboard Marine* made the comparison between affirmative misrepresentation and concealment because the CLRA then provided the exclusive remedy for conduct within its purview, and the plaintiffs had not complied with the procedural requirements of the CLRA. (*Outboard Marine, supra*, 52 Cal.App.3d at pp. 36, 40.)

[5] Daugherty also cites *Chamberlan v. Ford Motor Co.* (N.D.Cal. 2004) 223 F.R.D. 524, 525–527, and *Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282 [119 Cal.Rptr.2d 190], in which the courts certified or upheld certification of class actions under the CLRA involving nondisclosure—in *Chamberlan*, Ford's failure to disclose the defective nature of a plastic intake manifold, and in *Massachusetts Mutual*, an insurance company's failure to disclose its intention to lower the discretionary dividend rates it was paying when the plaintiffs purchased their policies. Neither case, however, purported to hold that a nondisclosure was actionable under the CLRA in the absence of a related representation or disclosure obligation; indeed, neither case purported to address the issue in any way. Cases are not authority for issues they neither discuss nor decide.

expensive cast iron. The plaintiffs sued under the unfair competition law and the CLRA. The court found no claim was stated under either law. As to the CLRA, the court held: "Plaintiffs' claim for violation of the CLRA fails because the second amended complaint neither alleged facts showing [DaimlerChrysler] was 'bound to disclose' its use of tubular steel exhaust manifolds, nor alleged facts showing [DaimlerChrysler] ever gave any information of other facts which could have the likely effect of misleading the public 'for want of communication' of the fact it used tubular steel exhaust manifolds. The second amended complaint did not allege a single affirmative representation by [DaimlerChrysler] regarding the exhaust manifolds." (136 Cal.App.4th at p. 1276.)

Daugherty asserts the complaint alleges facts showing Honda had a duty to disclose the alleged defect in its F22 engine and "made affirmative representations at the time of sale and thereafter," thus meeting the standards stated in *Bardin*. Neither assertion is correct. Daugherty alleged no facts that would establish Honda was " 'bound to disclose' " the defect in the F22 engine. (*Bardin, supra*, 136 Cal.App.4th at p. 1276.) Daugherty claims the complaint alleges Honda's knowledge of "unreasonable risk" to plaintiffs at the time of sale, but the "unreasonable risk" alleged is merely the risk of "serious potential damages"—namely, the cost of repairs in the event the defect ever causes an oil leak. The sole allegation mentioning "safety" is the paragraph claiming punitive damages, and that paragraph merely asserts a legal conclusion: that Honda's conduct was "carried on with a willful and conscious disregard for the safety of Plaintiffs and others, entitling Plaintiffs to exemplary damages under Civil Code § 3294." (See *Blank v. Kirwan* (1985) 39 Cal.3d. 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58] [courts treat a demurrer as admitting all properly pleaded material facts, but not contentions, deductions, or conclusions of fact or law].) The complaint is devoid of factual allegations showing any instance of physical injury or any safety concerns posed by the defect. (See *Bardin, supra*, 136 Cal.App.4th at pp. 1261–1262, 1270 [plaintiffs alleged the manufacturer knew and concealed fact that tubular steel exhaust manifolds prematurely cracked and failed much earlier than conventional cast iron manifolds; plaintiffs did not allege any personal injury or safety concerns and did not allege use of the manifolds violated any warranty or other agreement].) Honda's "affirmative representations at the time of sale" were its express warranties, as to which no breach occurred. (See pt. I., *ante*.) As in *Bardin*, no facts are alleged which show Honda "ever gave any information of other facts which could have the likely effect of misleading the public 'for want of communication' of" the defect in the F22 engine; Daugherty's complaint "did not allege a single affirmative representation" by

Honda regarding the F22 engine.[6] (*Bardin, supra,* 136 Cal.App.4th at p. 1276.) Accordingly, the trial court correctly concluded Daugherty did not state a viable nondisclosure claim under the CLRA.

## IV. *Violation of the unfair competition law.*

Daugherty asserts the conduct alleged in the complaint constitutes unlawful, unfair and fraudulent business practices within the meaning of the unfair competition law (UCL), Business and Professions Code section 17200 et seq. Again, we disagree.

■ Conduct violating the UCL includes "any unlawful, unfair or fraudulent business act or practice . . . ." (Bus. & Prof. Code, § 17200.) By proscribing unlawful business practices, the UCL borrows violations of other laws and treats them as independently actionable. In addition, practices may be deemed unfair or deceptive even if not proscribed by some other law. Thus, there are three varieties of unfair competition: practices which are unlawful, unfair or fraudulent. (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).) Daugherty fails to allege a violation of the UCL under any of the three prongs.

First, we rejected Daugherty's claims that Honda's conduct violated Magnuson-Moss and the CLRA. Consequently, Daugherty cannot state a violation of the UCL under the "unlawful" prong predicated on a violation of either statute, as there were no violations.[7]

---

[6] Daugherty contends Honda's press releases about the partial product update campaign that excluded 1990–1993 model years were "the type of affirmative representations that are likely to mislead 'for want of communication,' and thus trigger a duty of full disclosure under the CLRA." As the trial court pointed out, a recall of some vehicles cannot reasonably be interpreted as a representation that other vehicles are not defective, and the allegation about unspecified press releases "is too vague to indicate what fact was represented." In any event, those representations, such as they were, occurred in 2000 and 2001, not at the time of sale. The acts and practices forbidden by the CLRA are those "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services . . . ." (Civ. Code, § 1770, subd. (a).)

[7] In plaintiffs' reply brief, Daugherty asserts the allegation that Honda acted in "willful and conscious disregard for the safety of Plaintiffs" states a cause of action for unlawful business practices "because such conduct is violative of the Motor Vehicle Safety Act and the California Vehicle Code, both of which require notification and repair without charge" for defects involving safety concerns. This argument was not raised in Daugherty's opening brief on appeal and we may therefore disregard it. In any event, as discussed in part III., *ante,* the allegation Daugherty quotes is a conclusion, not a factual allegation; the complaint fails to allege any facts demonstrating safety concerns or otherwise suggesting a violation of the Motor Vehicle Safety Act or the California Vehicle Code.

Second, the conduct alleged does not constitute a fraudulent business act or practice. Unlike common law fraud, a Business and Professions Code section 17200 violation can be shown even without allegations of actual deception, reasonable reliance and damage. Historically, the term "fraudulent," as used in the UCL, has required only a showing that members of the public are likely to be deceived. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211 [197 Cal.Rptr. 783, 673 P.2d 660].) Daugherty contends Honda's failure to disclose the defect in the F22 engine at the time of sale, failure to include 1990–1993 model years in its product update campaign and press releases, and failure to give proper notice to purchasers of 1994–1997 model year cars is "likely to deceive" those customers "into believing that no such defect exists." We cannot agree that a failure to disclose a fact one has no affirmative duty to disclose is "likely to deceive" anyone within the meaning of the UCL. As observed in *Bardin*, *supra*, 136 Cal.App.4th at page 1275, "In order to be deceived, members of the public must have had an expectation or an assumption about" the matter in question. In *Bardin*, the complaint "did not allege . . . the public had any expectation or made any assumptions regarding the life span of the exhaust manifold" of the manufacturer's vehicles, or any facts showing the manufacturer had "made any representation of any kind, much less any misrepresentation, regarding its vehicles." (*Ibid.* [holding a complaint did not state a cause of action under the fraud prong of the UCL].) The same is true in this case. The only expectation buyers could have had about the F22 engine was that it would function properly for the length of Honda's express warranty, and it did. Honda did nothing that was likely to deceive the general public by failing to disclose that its F22 engine might, in the fullness of time, eventually dislodge the front balancer shaft oil seal and cause an oil leak.

Third, Daugherty asserts in its opening brief, without elaboration, that Honda's conduct was "inherently 'injurious' to consumers" and thus an unfair business practice under the UCL.[8] Again, we disagree. This court has recently

---

[8] Daugherty relies on *Chamberlan v. Ford Motor Co.* (N.D.Cal. 2004) 314 F.Supp.2d 953, 965, in which the court observed that, if the plaintiffs' allegations were proved, Ford's failure to include individual consumers in a recall "may be enjoined as unfair and fraudulent concealment and an exclusionary practice." In *Chamberlan*, the plaintiffs alleged Ford failed to disclose automobiles it manufactured had defective intake manifolds that cracked prematurely, exposing drivers and passengers to serious risk of injury. (*Id.* at pp. 955–956.) The case involved Ford's motion to dismiss the plaintiffs' UCL claim on preemption grounds. The trial court denied Ford's motion, holding that plaintiffs' claim was not preempted by the Motor Vehicle Safety Act (49 U.S.C. § 30101 et seq.), as Congress did not intend to supplant all state regulation of motor vehicle safety. (314 F.Supp.2d at p. 961.) *Chamberlan* is not, in our view, "strikingly analogous" to this case, and does not support the conclusion that Honda's conduct constituted an unfair business practice, because *Chamberlan* involved a "dangerous manifold defect." (*Id.* at p. 963.) Indeed, *Chamberlan* observed that the plaintiffs had not requested the court to find that the manifolds were " 'unreasonably dangerous and defective,' " "[p]resumably . . . in part because [Ford] allegedly has already conceded the danger of the manifold

formulated a test for determining whether a practice is unfair in consumer cases under the UCL. Guided by *Cel-Tech*, we concluded the factors defining unfairness are the same as those used under section 5 of the Federal Trade Commission Act (15 U.S.C. § 41 et seq.) (section 5 test). (*Camacho v. Automobile Club of Southern California* (2006) 142 Cal.App.4th 1394, 1403 [48 Cal.Rptr.3d 770].) An act or practice is unfair if the consumer injury is substantial, is not outweighed by any countervailing benefits to consumers or to competition, and is not an injury the consumers themselves could reasonably have avoided. (*Ibid.*) In this case, we need not analyze all factors in the section 5 test, because the conduct alleged fails to meet the first factor: The injury to consumers is not substantial, if indeed it can be characterized as a cognizable injury at all.[9] (See *Bardin, supra,* 136 Cal.App.4th at p. 1270 [complaint did not state a UCL claim for unfair business practices; use of less expensive and less durable materials in vehicles to make more money did not violate public policy, no representations were made by the manufacturer about the composition of the exhaust manifold (which was made with steel instead of industry-standard cast iron), plaintiffs alleged no personal injury or safety concerns, and no warranty or other agreement was violated].) In short, the failure to disclose a defect that might, or might not, shorten the effective life span of an automobile part that functions precisely as warranted throughout the term of its express warranty cannot be characterized as causing a substantial injury to consumers, and accordingly does not constitute an unfair practice under the UCL.[10]

---

defect . . . ." (*Id.* at p. 965.) While Daugherty's appellate briefs refer to "safety risks" and "a significant and dangerous defect," the complaint itself, as we have noted elsewhere, is devoid of factual allegations that the alleged defect caused any physical injuries or posed any safety risk.

[9] We would reach the same result if we were to apply any of the tests that other courts of appeal have employed to determine whether a business act or practice is unfair within the meaning of the UCL. The conduct alleged is not a business practice that " ' "offends an established public policy or . . . is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." . . . ' " (*Smith v. State Farm Mutual Automobile Ins. Co.* (2001) 93 Cal.App.4th 700, 718–719 [113 Cal.Rptr.2d 399], citations omitted [court must weigh the utility of defendant's conduct against the gravity of the harm to the alleged victim].) And, to the extent Daugherty's claim of unfair practices may be predicated on public policy, there are no "specific constitutional, statutory or regulatory provisions" to which that policy is tethered. (*Gregory v. Albertson's, Inc.* (2002) 104 Cal.App.4th 845, 854 [128 Cal.Rptr.2d 389] ["where a claim of an unfair act or practice is predicated on public policy, . . . *Cel-Tech* . . . require[s] that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions"].)

[10] Because Daugherty's complaint does not allege conduct that violates the UCL, we need not consider Honda's alternative contention that the remedies Daugherty seeks—disgorgement of profits and injunctive relief in the form of an expanded recall—are unavailable as a matter of law because they are disguised claims for damages and because the recall sought is preempted by federal law.

## DISPOSITION

The judgment is affirmed. Respondents are to recover their costs on appeal.

Rubin, Acting P. J., and Flier, J., concurred.

On November 8, 2006, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied February 7, 2007, S148931. Kennard, J., was of the opinion that the petition should be granted.